# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

VENUE: OAKLAND

SEALED BY ORDER OF THE COURT



CR 25 0267

UNITED STATES OF AMERICA,

V.

GLEB GORA,
SERGEI RYZKHOV, and
MICHAEL VOGEL,

AMO

**F I L E D**

AUG 28 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DEFENDANT(S).

# INDICTMENT

18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud
18 U.S.C. § 1343 – Wire Fraud
18 U.S.C. § 981(a)(1)(C)
28 U.S.C.§ 2461(c) – Forfeiture Allegations

A true bill.

/s/ Foreperson of Grand Jury

Foreman

Filed in open court this 28th day of

August, 2025

Clerk

Bail, $ No Bail Warrants for all 3 defendants
8/28/25

Hon. Donna M. Ryu, Chief Magistrate Judge

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

FILED

AUG 28 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

SEALED BY ORDER
OF THE COURT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>GLEB GORA,<br>SERGEI RYZKHOV, and<br>MICHAEL VOGEL,<br><br>    Defendants. | CASE NO. **CR 25 0267** <br><br>VIOLATIONS:<br>18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;<br>18 U.S.C. § 1343 – Wire Fraud;<br>18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture Allegation<br><br>OAKLAND VENUE<br><br>UNDER SEAL |



## INDICTMENT

The Grand Jury charges:

Introductory Allegations

At all times relevant to this Indictment:

1.      Vortex ("VORTEX") was a company registered in Saint Kitts & Nevis that operated both inside and outside the United States. VORTEX had a public website ("https://www.vortex.foundation"), through which it offered services to cryptocurrency companies, including "transparent market-making" and "boosting token liquidity," all under the tagline: "Grow Your Token. Your Way."  The website claimed that Vortex had a "client portfolio exceeding 180 partners" in 2024.

2.      Defendant Michael Vogel ("VOGEL") resided in Moscow, Russia and served as a Business Development Manager at VORTEX.

INDICTMENT                                                    1

Document No.

District Court
Criminal Case Processing

3.      Defendant Gleb Gora ("GORA") resided in the United Arab Emirates and was the founder and Chief Executive Officer (CEO) of VORTEX.

4.      Defendant Sergei Ryzkhov ("RYZKHOV") resided in Moscow, Russia and Dublin, Ireland and worked as the Chief Financial Officer (CFO) of VORTEX.

5.      Co-Conspirator 1 ("CC-1") resided in Israel and held the title of Chief Product Officer at VORTEX.

6.      The Powerlink Token ("PLNK") was a cryptocurrency token created at the direction of law enforcement.  Powerlink operated on the Ethereum blockchain.

7.      Beginning on a date unknown to the Grand Jury but no later than on or about September 26, 2024, and continuing through a date unknown to the Grand Jury, but to at least on or about October 9, 2024, the defendants VOGEL, GORA, and RYZKHOV, and others known and unknown to the Grand Jury, conspired to manipulate the trading volume and price of one or more cryptocurrencies, including Powerlink, in order to profit through payments from cryptocurrency companies and from the sale of the manipulated cryptocurrencies at inflated prices.

Key Terms

8.      Virtual currency is a digital asset or digital representation of value that can be electronically traded and exchanged online.  Similar to many fiat currencies, many virtual currencies have a market-based value that goes up or down based on various factors.

9.      Cryptocurrency is a subset of virtual currency that utilizes blockchain technology.  A blockchain is a distributed ledger, recorded on a decentralized network, containing an immutable and historical record of transactions made with the cryptocurrency.

10.      Ethereum is a well-known blockchain that could be used to create different cryptocurrencies.  Ether ("ETH") is the primary Ethereum-based cryptocurrency.  Many other Ethereum-based cryptocurrencies utilize the Ethereum blockchain, which are referred to in the cryptocurrency community as "tokens."

11.      Cryptocurrency can be stored in a cryptocurrency "wallet" located, for example, in an electronic storage device, in a cloud-based server, or on a cryptocurrency exchange.  Cryptocurrency transactions can be made between wallets.

INDICTMENT                                  2

12. Cryptocurrency "exchanges" are digital marketplaces where individuals can purchase or trade cryptocurrencies. Depending on the exchange's level of control over its listings and trading, exchanges are typically referred to either as "decentralized" (commonly abbreviated as "DEX") or "centralized" (commonly abbreviated as "CEX"). During the relevant period, Uniswap operated as a decentralized cryptocurrency exchange that was available to the public, including to individuals in the United States.

13. A "market maker" in the cryptocurrency industry is a company that offers services to cryptocurrency companies. Legitimate market-making services may include, for example, providing liquidity to buyers and sellers to facilitate trading of a token, the active monitoring of cryptocurrency trading and price fluctuations, and related consulting services.

14. "Wash trading" occurs when a single trader or multiple traders, working in coordination, act as both the buyer and the seller in the same transaction or a series of transactions, such that there is no change in beneficial ownership. These transactions serve no legitimate economic purpose and are designed solely to generate misleading market information and to create the false impression of market interest to induce other investors to buy or sell an asset.

The Conspiracy and Scheme to Defraud

As part of the conspiracy and scheme to defraud:

15. VORTEX purported to be a market maker for cryptocurrency projects. In reality, VORTEX perpetrated a widespread market manipulation scheme by wash trading new cryptocurrencies that were being launched on the market.

16. VORTEX customers paid around $3,900 per month to artificially inflate the trading volume of the customers' crypto tokens through wash trading. This trading tactic created the appearance that VORTEX customers' cryptocurrencies had more active, organic trading markets than actually existed, thereby inducing investors to purchase those cryptocurrencies at artificially inflated prices.

17. In addition to receiving a monthly fee from its "market making" for customers, VORTEX structured its client agreements so that it received a portion of the customer's cryptocurrency that VORTEX was helping to launch on the market. VORTEX profited by selling its own holdings of the

INDICTMENT                    3

manipulated cryptocurrency at the inflated trading prices that VORTEX created following the cryptocurrency launch.

****

The Conspiracy Among Vortex Employees to Manipulate Crypto Token Markets

18.    On or about September 9, 2024, a law enforcement Undercover Employee ("UCE") sent a message to VORTEX, via a Telegram account listed on VORTEX's public website.  In the message, the UCE expressed interest in retaining VORTEX's market-making services for the launch of the Powerlink token.

19.    On September 12, 2024, "Vortex Foundation" responded in the Telegram chat: "I've added our CEO @gleb_vortex, CMO [Chief Marketing Officer], and @leya_vortex from BD team."

20.    On or about September 12, 2024, VORTEX's CMO messaged the UCE in the Telegram chat suggesting that they set up a brief call to discuss details.

21.    The UCE noted that he would be traveling the following week and then added: "I'll get on your calendar as soon as I return."

22.    On or about September 18, 2024, Vortex's CMO wrote to the UCE: "If you travel to Singapore we can meet."

23.    On or about September 24, 2024, Vortex CMO Igor Dubov added defendant VOGEL to the Telegram chat.

24.    On September 25, 2024, VOGEL and the UCE exchanged messages and agreed to schedule a call to discuss details on Friday, September 27, 2024, at 9 a.m. Pacific Time.

25.    VOGEL also sent the UCE a message stating: "Hope you traveled safe.  You were at 2049 right?" The global cryptocurrency conference TOKEN2049 Singapore was held in Singapore on or about September 18-19, 2024.

26.    On or about September 25, 2024, VOGEL asked for the UCE's email address, and the UCE provided a Gmail address to VOGEL.

27.    On or about September 27, 2024, the UCE conducted a videoconference with VOGEL about the launch of the Powerlink token during which VOGEL said that VORTEX would pump up trading volumes and the market cap for the UCE's new Powerlink token on the day of its launch.

INDICTMENT                                4

28.     VOGEL assured the UCE that VORTEX would, as it pumped up trading volumes and the price of the Powerlink token, make the trading look "organic."

29.     During the video call, VOGEL made the following statements to the UCE about the "market making" services that VORTEX provided to its clients:

   a. *"We can make such volume as you want. The only limit is like how much liquidity we have. The more liquidity we have, the more volume we can create, and the more organic it will look . . . . From the volume part, the sky is the limit."*

   b. *"If you can tell us ,like what exactly you want to see what volumes you want to see, what price you want to reach, and you can share with us your economics, we can just make the calculation how much you will need, I mean how much funds you will need to do so."*

   c. *"You also should keep in mind the 10:1 ratio. In our practice, if you can give us, for example 10x liquidity, from that we can create organically, not organically, I mean it will look organic, not like it's organic, truly organic, it will look organic. So I mean from 10k we can create around 100 of daily volume. From our practice, it's like the most organic and natural ratio not to be too suspicious . . . ."*

30.     VOGEL also made the following statements to the UCE about why VORTEX's "market making" needed to be hidden from other market participants to be effective:

   a. *"Market making is something like drugs in professional sport. I mean everybody use[s] it, and it's absolutely essential to use it to win big prizes. And, uh, like Olympics or some other championships. But no one will tell you honest like they're using it. . . Something like that with market making. It's essential for . . . long-term prosperity, but no one will tell you honest, yeah, we do such things.  In that case, it should look as organic and natural as possible for the community . . . ."*

   b. *"That's why it's really important to synchronize it with the marketing activities not to look suspicious like if some price trend or volume pump out of nowhere, it always looks not right for people. But if it's synchronized with marketing . . . in that case it look organic and that's what makes people believe the project is alive and well and great."*

INDICTMENT                                          5

31.    With respect to VORTEX as a company, VOGEL told the UCE:

a.    *"The company I [am] working for, Vortex, they were around from like 2019, for 4-5 years now. Right now, we have around 150 clients. Our main focus is market making."*

b.    *"We have a lot of focuses on our web page, but market making is the only service we do in-house . . . ."*

c.    *"Our main goal I suppose and what makes us different from other market makers out there . . . is that . . . we are aiming on profit trading for our clients."*

32.    Toward the end of the video chat, VOGEL added RYZKHOV to the Telegram chat and identified RYZKHOV to the UCE as VORTEX's Chief Financial Officer (CFO).

33.    In the Telegram chat, VOGEL also asked the UCE to share his company's full name, company registration number and address, the position of the signer, and [e]mail for DocuSign so that Vortex could prepare a market making contract that the UCE and Vortex would execute via DocuSign.

34.    On or about September 28, 2024, RYZKHOV sent the UCE a VORTEX market making agreement via DocuSign and sent a message to the Telegram chat notifying the UCE that he had sent the agreement for digital signature.

35.    On or about September 30, 2024, the UCE electronically signed the agreement with VORTEX, which was digitally signed by RYZKHOV.  Pursuant to the contract, VORTEX agreed to provide market-making services for the Powerlink Token in return for a monthly fee of $3,900.

36.    In addition to a monthly fee for its services, the contract specified that VORTEX would be entitled to: *"1.5% of the cash out done by Vortex on a monthly basis"* and *"15% of the net profit done by Vortex on a monthly basis."*

37.    The contract also stated that *"Vortex shall refrain from conducting any illicit or unlawful market manipulation activities with the Token and/or the Capital . . . ."*

38.    On or about October 4, 2024, the UCE and VORTEX agreed to launch the Powerlink token on October 9, 2024 on the Uniswap exchange.  The UCE messaged the VORTEX team that Powerlink would be sending them around $8,750 worth of ETH and 50 million PLNK tokens for VORTEX to trade in support of the launch.

INDICTMENT                                6

39. CC-1 provided the UCE the following wallet address, which CC-1 explained was "for Eth and token deposits".

40. On or about October 4, 2024, the UCE requested that VORTEX provide a list of wallets that would be used for VORTEX's market making on the day of launch.

41. GORA, VORTEX's CEO, responded on the Telegram Chat: "*The trading happens from a series of self-destructible proxy wallets, that are deleted after a few transactions and look like organic traders. It's impossible to provide all of those addresses now, but you'll have access to the real-time monitoring panel where you'll have access to all balances, stats, outflows/inflows and key wallet addresses.*"

42. GORA's message above was later deleted from the Telegram chat with the UCE on October 9, 2024, sometime between 12:30 p.m. and 3:06 p.m. Pacific Time.

43. On or about October 5, 2024, a VORTEX employee messaged the UCE on the Telegram chat to determine how high VORTEX could pump the price of the PLNK token before implementing a cash-out strategy: "*We would also like to ask if you are more comfortable with a cash-out strategy without price impact after raising the price by 50%-100%.*"

44. The UCE responded: "*Let's focus on the price increase first, and we can focus on cash-out a week after our launch.*"

45. On October 8, 2024, GORA messaged the UCE on Telegram reminding the UCE to send the market making funds—a stock of PLNK tokens and roughly $10,000 worth of ETH cryptocurrency Ethereum—so that VORTEX could prepare for its trading activities when the PLNK token launched on October 9, 2024.

Wash Trading of the Powerlink Token

46. On or about October 9, 2024, around 9:45 a.m. Pacific Time, law enforcement launched the Powerlink token (PLNK) to the public through a liquidity pool on the Uniswap exchange.

47. Earlier that morning, the UCE provided VORTEX with roughly $8,500 worth of the cryptocurrency Ethereum (ETH) and 50 million PLNK tokens for VORTEX to carry out wash trading of PLNK in order to pump up its price immediately once the token was launched.

INDICTMENT                                    7

48.     Around 9:54 a.m. Pacific Time, the UCE messaged CC-1 on the Telegram chat and stated that he wanted to see "$15K in volumes" within the first hour of launch. CC-1 acknowledged the request.

49.     On or about October 9, 2024, VORTEX engaged in wash trading of the Powerlink Token on the Uniswap cryptocurrency exchange until law enforcement suspended trading activity.

50.     Around 10:22 a.m. Pacific Time, the UCE messaged the Telegram chat asking VORTEX to provide real-time proxy wallet addresses so that the UCE could distinguish between inorganic and organic volumes as trading continued on Uniswap.

51.     CC-1 sent a list of proxy wallets to the UCE via Telegram message around 10:26 a.m.

52.     On or about October 9, 2024, VORTEX employees and the UCE exchanged the following messages on the Telegram chat while wash trading the Powerlink Token continued:

    a.  Around 10:54 a.m., the UCE wrote: *"Great work on the volume generation! Could you let us know how many organic trades and how much organic volumes have occurred thus far? In regards to price pump, what do you think we can accomplish within the next hour or so?"*

    b.  Around 11:36 a.m., CC-1 wrote: *"Depends on the price we want to reach*[.] *What's the target?"*

    c.  Around 11:52 a.m., the UCE wrote: *"Can we target a token price of $0.0013 (30% increase from the current price) in the next hour?"*

    d.  Around 11:54 a.m., CC-1 wrote: *"Absolutely, we'll have to buy with 0.7 Eth - that's ok?"*

    e.  Around 11:56 a.m., the UCE wrote: *"Ok to use 0.7 of the ETH we provided."*

53.     Around 11:37 a.m. Pacific Time, the UCE shared the list of Vortex proxy wallets received from CC-1 with agents who calculated that roughly 95% of the trading volume at that point was inorganic (*i.e.*, generated by VORTEX).

54.     Around 12:30 p.m. Pacific Time, on or about October 9, 2024, the United States Attorney's Office for the District of Massachusetts issued a press release entitled, "Eighteen Individuals and Entities Charged in International Operation Targeting Widespread Fraud and Manipulation in the Cryptocurrency Markets." The press release referred to several newly unsealed indictments against

INDICTMENT                                          8

market makers for allegedly wash trading a cryptocurrency token on the Uniswap exchange which was created at the direction of the Federal Bureau of Investigation.  The press release also stated that one of the defendants had been arrested overseas.

55.     After the press release, the UCE observed that some of the messages in the Telegram chat with VORTEX were deleted.

56.     Around 2:45 p.m. Pacific Time, the UCE wrote to VORTEX employees on the Telegram chat: "*Team - is it possible to get another updated list of your wallets? We are trying to track the organic activity and there seem to be more proxy wallets used in addition to the original list you gave.*"

57.     Around 3:06 p.m. Pacific Time, about 2.5 hours after the District of Massachusetts press release, GORA responded to the Telegram chat: "*all volume is currently organic or is generated by our HFT algos - we've previously used our community to generate volume and deployed HFT trading strategies on our end to boost volumes without wash trading.*"

58.     Around 4:17 p.m. Pacific Time, the UCE wrote to the Telegram chat:  "*It looks like the trading has stopped?*"

DMP-AUSA  AL-FORZPERSON

59.     Around 4:31 p.m. Pacific Time, GORA ~~CC-1~~ responded to the Telegram chat: "*it seems that there's no retail traders on the market and we are not able to continue doing the same strategy to generate trading profits or increase the overall volume since it would be simply considered wash trading. We are only allowed to counter trade with other parties and not with ourselves as we are compliant with US & EU requirements.*"

60.     A short time later, law enforcement suspended trading of the PLNK token by removing the liquidity pool from the Uniswap market.

61.     Law enforcement analysis of the blockchain data associated with the trading of the PLNK token showed that substantially all of the trading activity generated during the launch of Powerlink was the result of VORTEX's wash trading activities.  Specifically, the analysis revealed that there was a total of about 2,789 trades of the Powerlink Token.  About 99.8% of these buy/sell transactions were conducted by Vortex.

62.     During the roughly six hours during which trading occurred, Vortex increased the market capitalization of the PLNK token by roughly $100,000.

INDICTMENT                                      9

63. Vortex employees used means and instrumentalities of interstate commerce in connection with the above actions in the scheme to defraud, including email and messaging communications, electronic funds transfers, and cryptocurrency transfers.

GORA Moves Funds from the Wallet to which the UCE Sent the Market Making Payment to His Own and RYZKHOV's Personal Exchange Accounts

64. The day after the PLNK wash trading—October 10, 2024—GORA made two transfers of cryptocurrency totaling 29,913 USDT (Tether) from the VORTEX wallet into which the UCE paid the agreed market making fee to a MEXC Global exchange account held under the email address glebgora.eth@gmail.com.

65. Earlier, GORA had used funds from his personal Binance exchange account to pay the initial gas fees for the VORTEX wallet to which the UCE sent the marketing making fee.

66. "Gas" is the cryptocurrency fee required to conduct a transaction on a blockchain. In the case of the Ethereum blockchain, gas must be paid in its native virtual currency, ETH. Movement of other virtual currency tokens on the Ethereum blockchain (such as USDT or USDC) must be funded by "gas fees" paid in ETH.

67. By following the trail of these "gas fees," investigators can connect individuals to an unhosted wallet (an address with no information identifying the owner) because "gas fees" can generally be traced to a cryptocurrency exchange, like Binance, that requires identifying know-your-customer (KYC) information such as a passport or national ID card.

68. Two days after the PLNK wash trading—on or about October 11, 2024—GORA moved roughly 69,000 USDC (Circle) out of the VORTEX wallet into which the UCE paid the market making fee. GORA sent roughly 21,000 USDC to GORA's MEXC Global exchange account. About two minutes later, GORA sent roughly 48,000 USDC to RYZKHOV's Binance account.

69. On or about November 1, 2024, GORA transferred 4 ETH out of the VORTEX wallet into which the UCE paid the market making fee. In two transfers on or about November 8, 2024, and December 18, 2024, GORA transferred 3.7 of this ETH to his Binance account.

\\

\\

INDICTMENT 10

**COUNT ONE:** (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

70. Paragraphs 1 through 69 of this Indictment are re-alleged and incorporated as if fully set forth here.

71. Beginning at a date unknown to the Grand Jury but no later than on or about September 27, 2024, and continuing through a date unknown to the Grand Jury, but to at least on or about October 9, 2024, both dates being approximate and inclusive, in the Northern District of California and elsewhere, the defendants,

GLEB GORA,
SERGEI RYZKHOV, and
MICHAEL VOGEL,

and others, known and unknown, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and concealment of material facts, and, for the purpose of executing such scheme or artifice and attempting to do so, transmit, and caused to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

**COUNT TWO:** (18 U.S.C. § 1343 – Wire Fraud)

72. Paragraphs 1 through 69 of this Indictment are re-alleged and incorporated as if fully set forth here.

73. Beginning at a date unknown to the Grand Jury but no later than on or about September 27, 2024, and continuing through a date unknown to the Grand Jury, but to at least on or about October 9, 2024, both dates being approximate and inclusive, in the Northern District of California and elsewhere, the defendants,

GLEB GORA,
SERGEI RYZKHOV, and
MICHAEL VOGEL,

together with others known and unknown, did knowingly and with the intent to defraud participate in, devise, and intend to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and

INDICTMENT 11

by means of concealment of material facts.

The Use of the Wires

74.     On or about the dates set forth in Count Two, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud and attempting to do so, the defendants,

GLEB GORA,<br>
SERGEI RYZKHOV, and<br>
MICHAEL VOGEL,

did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically:

| COUNT | DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| TWO | September 27, 2024 | Videoconference between defendant VOGEL, located outside the Northern District of California, and a UCE located within the Northern District of California, to discuss artificially inflating the trading volume of the Powerlink Token through manipulative trading. |

All in violation of Title 18, United States Code, Section 1343.

FORFEITURE ALLEGATION:     (18 U.S.C. § 981(a)(1) and 28 U.S.C. § 2461(c))

75.     The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1) and Title 28, United States Code, Section 2461(c).

76.     Upon conviction for any of the offenses set forth in Count One and Count Two of this Indictment, the defendants,

GLEB GORA,<br>
SERGEI RYZKHOV, and<br>
MICHAEL VOGEL,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of those violations, as the result of those violations, including but not limited to:

      a.     any cryptocurrency wallets used by VORTEX employees to receive payment for market manipulation services.

INDICTMENT                    12

b.    any cryptocurrency wallets used by VORTEX to hold "cash-out" (i.e. liquidation) profits from market manipulation.

If any of the property described above, as a result of any act or omission of the defendants:

a.    cannot be located upon exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

DATED:  August 28, 2025                                        A TRUE BILL.


                                                                          FOREPERSON


CRAIG H. MISSAKIAN
United States Attorney


/s/ Daniel M. Pastor
DANIEL M. PASTOR
BENJAMIN K. KLEINMAN
MOLLY K. PRIEDEMAN
Assistant United States Attorneys


INDICTMENT                                         13